BFL LAW LLP
TERRI L. FUJIOKA-LILLEY, 9590
75-127 Lunapule Road, Ste. 8B
Kailua-Kona, HI 96740
Telephone: (808) 345-7662
terri@bfl.law

THE LAW OFFICE OF WALTER J. RODBY LLC
WALTER J. RODBY (5594)
733 Bishop Street, Ste. 2302
Honolulu, HI 96813
Telephone: (808) 545-5490
attorneyrodby@msn.com

*Attorneys for John B. Stancil (02)*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| UNITED STATES OF AMERICA, | No. 1:19-cr-000099-DKW-KJM |
|---|---|
| Plaintiff, | |
| vs. | DECLARATION OF JOHN B. STANCIL |
| JOHN B. STANCIL (02), | |
| Defendant. | |

DECLARATION OF JOHN B. STANCIL

I, JOHN B. STANCIL, declare as follows:

1. I am a defendant in the above-captioned case.

2. I am currently detained at FDC-Honolulu and have been since my arrest on July 15, 2020. The headings contained in this Declaration are for convenience and, while accurate, are not intended as statements of fact.

PERSONAL HISTORY:

3. I was born on the Island of Oahu in 1987, and have lived on Oahu my entire life except for a short time when I lived in Las Vegas, Nevada around 2005-07. I have a passport but have never traveled internationally.

4. A true and correct, appropriately redacted, photocopy of my passport is attached at Exhibit 10.

5. Prior to my arrest in July 2020, I had been employed as a driver for movie and television filming through the Teamsters Union since approximately 2010.

6. During the COVID-19 pandemic, I was unable to work because filming was paused due to health risks.

7. I believe that if released and ordered to work, I could get work as a driver with the Teamsters Union.

8. The government has asserted that I was employed by Kamaʻaina Termite and

Pest Control ("KTPC") at the time of my arrest, but that is incorrect. I had a high school job at KTPC in 2004. In 2005, I moved to Las Vegas and worked for a tile company. I have not been employed by KTPC since.

9. I have seen in the Pretrial Services reports prepared in this case that their data searches revealed outstanding warrants for me in Las Vegas, Nevada. I can only imagine those relate to a traffic ticket from 2006, which I paid. My lawyer was able to confirm through Las Vegas court records that the fines show as paid as of February 2, 2008.

10. I have had only one non-traffic criminal conviction in my life, when I pled no contest to assault charges based on a fight that occurred at M Nightclub in 2012. I was sentenced to 1 year of probation and, because I was intoxicated at the time of the offenses, I was subjected to substance use probation conditions. Although the court did not order me to participate in anger management classes, I did so at my own expense, in consultation with my probation officer, and successfully completed the class. I successfully completed probation with no incidents between July 3, 2018 and July 2, 2019. If the paperwork I signed for Pretrial Services did not already do so, I give the Court and Pretrial Services my

permission to contact my former probation officer, Shawn Naito, to confirm details of my probation compliance.

11. In 2018, I learned that I was about to become a father for the first time. This was very happy news and I realized I needed to step up so that I could be the sort of father I wanted to be for my son—the sort of loving father I had as a child.

12. At that time, I had been a member of the Teamsters Union—just like my dad—for approximately 8 years. My jobs with the Teamsters had been limited because I did not have a commercial driver's license ("CDL"). In August 2018, I completed a class and subsequently received my State of Hawaiʻi, Class A CDL. After that I was able to get more frequent and better paying jobs though the Teamsters. I enjoyed the working as a driver on movie and television sets, made good money, and was able to rent a nice apartment in Honolulu for my family and take care of my family financially.

13. When the global COVID-19 pandemic hit in 2020, my work, like that of many others, was shut down. At the time of my arrest in 2020, I was not working, was receiving unemployment compensation, and was having trouble paying rent.

14. If I am released from detention and permitted or directed to be employed while

on bond, I believe that I could get well-paid work through the Teamsters Union. I would like to be able to work again and contribute to my son's care and to begin to repay my parents, who have supported me while in custody and even took out a mortgage on our home in Waimanalo when I was first arrested to pay for a lawyer to defend me in this case.

### ARREST AND DETENTION

15. In the very early morning of July 15, 2020, I was asleep in bed with my girlfriend and our 21-month old son. We were awakened by the sound of someone at our front door. When I went to check, federal law enforcement agents broke through our apartment door. I complied fully with their commands and was taken into custody. My girlfriend who came out to see what was going on was also handcuffed. She told the agents that our baby was still in bed. They went to our bedroom and brought out our son, who was frightened. I asked the agents to please uncuff my girlfriend and give the baby to her, and they did so. After that, all the agents left the apartment with me in custody.

16. I have had no disciplinary write ups during my detention at FDC from July 15, 2020 to the present.

17. I have been housed in FDC Unit 4A along with various co-defendants and cooperators in this case since 2020. I have not posed and do not pose a threat to anyone's safety at FDC, and I am unaware of anyone who poses a threat to my safety at FDC.

18. While detained I have worked hard to review the evidence against me and my co-defendants that has been received from the government. When I first began receiving electronic discovery at FDC I utilized the 3 hours of law library time available to people in my unit every Wednesday. As more and more electronic discovery was received, I realized that I needed more time and worked with FDC staff on my unit and in the library to expand the time available to me from 3 to 6 hours per week. By using 6 hours of library time per week, I had to forego lunch on library days because lunch was served during those 6 hours and no food is permitted in the education wing where the FDC law library is maintained. Still, I knew I needed all the time I could get to review the discovery, so I continued to use the 6 hours and skipped lunch on Wednesdays to do so.

19. Law library time has been important to me because it was the only way I could

confidentially review my discovery when I was in general population unit 4A. Although there is a computer in the open area of the unit for detainees to use for TRULINCS email access, it is out in the open and anyone can look over my shoulder to see what I am reading. At various times when I was on unit 4A, I was housed with witnesses and cooperators in this case. Also, I was housed with guys who wanted to be government witnesses and who easily could have learned information from my documents that they could use to convince the government that they were knowledgeable about events described in my discovery and that could lead the government to believe untrue information that the individual added or to believe that the individual could verify one version of events in one of the many times that existing government witnesses tell different stories. This was particularly important to me because from my, still limited, review of the discovery, it was clear that the government's case is based primarily on statements of cooperating witnesses and those witness statements conflict in a number of critical ways. It seems logical that if someone in my unit saw some of these statements and told the government that it was information from their personal knowledge, that could be used to corroborate

an otherwise unreliable witness whether the statement was true or not.

20. In October my lawyer began working to try to get me additional access to review discovery privately. We worked with FDC to open a discovery review room in an unused room on the upper tier of Unit 4A and make it available every weekday for about 12 hours per day for my use and the use of my co-defendants—who also need to review the large volume of discovery in this case. This entitled me to 3-4 hours of computer time on Monday, Tuesday, Thursday, and Friday, and I continued to utilize my 6 hours of library time on Wednesdays for a total of 18-22 hours per week, and tried to use any time that my co-defendants did not want to use the discovery room on the unit.

21. The additional time was helpful and appreciated, but my lawyer and I determined that I needed to spend at least 40 hours per week preparing for trial and the recent accommodation cannot supply that much time.

22. Other problems, related to the FDC computers and the limited software prevented my review of the government's discovery. When these problems were called to the attention of FDC, they made upgrades to the computers and that helped with reviewing more of the .pdf files.

23. Spreadsheets remain unreviewable on the FDC computers. When I open a spreadsheet, the cells containing data are small and the data is not all visible. With the view-only software on FDC computers, I cannot expand the cells to see the all the data, cannot search the spreadsheet, cannot sort or filter the data. My attorney tried printing some of the spreadsheets, but most are so big they are not useful in printed form—the cells are too small to read or the rows run across several pages.

24. There also are problems opening some audio and video files produced. The recent upgrades to the FDC computers and addition of VLC media player has made more, but not all, accessible. The government has produced a number of very large "zipped" files. We have worked a lot with FDC technicians but some of the files cannot be unzipped on FDC hardware. One reason is because the files are too large. They take several hours to unzip, but FDC computers must be re-booted every 2 hours, so these file can never be unzipped and viewed on FDC computers. It is not practical to print that volume of data, there would not be room to store it—assuming the unzipped files would be printable documents.

25. The FDC computers do not contain any basic software for word processing,

spreadsheet usage (described above) or marking up .pdf documents. I cannot create or edit any sort of document. The FDC computers won't let me create folders or organize or move files on my hard drives. I cannot mark up or edit my counsels' digital work product or create summaries of the evidence to assist them in my defense.

### REMOVAL TO SHU

26. On May 10, 2023, FDC staff pulled me out of art class and told me that the Lieutenant needed to speak with me.

27. I went out to the hallway where I was handcuffed and told that I was being taken to the SHU—FDC's special housing unit.

28. I was provided with paperwork advising me that I was being removed to the SHU pending classification.

29. My property was removed from my room in general population unit 4A, where I have been housed for nearly three years, and impounded. I was permitted to retain only two expandable file folders containing a small fraction of my legal materials. My plastic bins, in which I had organized my legal materials over the past nearly three years were also impounded, as were my hard drives and

computer disks containing discovery in my case. All my other personal property—including clothing, food, personal care items, magazine, and family photographs—also was impounded. In addition, I have paid subscriptions to approximately a half-dozen magazines that I am unable to receive in SHU.

30. I am particularly concerned about my plastic bins of discovery because when I was sent to SHU my property was impounded and thrown into large clear plastic trash bags. Similarly, when my brother, Michael Miske, was released from SHU after many months, his property was returned to him in the same sort of trash bags. I have spent 3 years compiling and organizing my discovery, my notes, and my lawyer's notes in those plastic bins. If everything was, as I fear, dumped into big plastic trash bags, all that work was for nothing.

31. My housing in SHU also means that I have lost all privileges associated with being detained in general population. A more detailed, but still incomplete, listing of the differences between general population and SHU is attached hereto as Exhibit 11. I have reviewed Exhibit 11, and the information in it accurately reflects my experience of being housed in SHU since May 10, 2023. The information below is only a sample of the deprivations that have been

imposed since my transfer to SHU.

32. By far the worst part of being housed in SHU is the lack of contact with my family. In general population I was allowed up to 510 minutes of personal phone calls, mostly to my mom, and I was able to save up my minutes to speak with my mom on the weekends when she cares for my son. I would try to save as many minutes as possible so I could have longer calls and speak with my son on the weekends. I also had unlimited access to TRULINCS email and could email with my family or lawyers whenever I liked. In SHU I am not permitted any access to email and I am told that I will receive one 15-minute phone call per month. I have been in SHU over a month and have not been permitted to make a single phone call.

33. Also in general population, I was permitted to have in-person family visits. Because of COVID-19 restrictions, I was only able to see family members through clear plastic dividers used to prevent spread of the virus, but it was very encouraging to talk in person with my family members.

34. Unfortunately, I was transferred to SHU the day before COVID-19 restrictions were lifted. Since June 11, 2023, detainees have been permitted to meet with

their family members directly, without the plastic barrier and are permitted a brief hug and kiss at the beginning and end of each visit. Knowing that it could be possible to hug and kiss my now 4-year old son if I were not in SHU is killing me. As it is, I am able to speak with family only during a "video visit" on weekends when my mom comes to see me. The video visits are difficult. The video monitor is poor quality and cuts out. We talk over a telephone handset that cuts out all the time. I have to wave to my mom to jiggle the handset to get the audio working again. This happens repeatedly throughout the visit.

35. In SHU I have only the two expandable folders and items issued in SHU: 1 orange jumpsuit, 1 pair orange boxer shorts, 1 orange t-shirt, 1 pair orange socks, 1 pair orange Crocs, 1 sheet, and 1 blanket. The linens are supposed to be changed every 2 weeks, but with I first arrived in SHU, another detainee told me he had not received new linens for 3 weeks. I was not permitted to keep my pillow from general population and I was not issued another pillow. I have been folding up a sheet or blanket for a pillow, but my neck is sore from sleeping awkwardly without a pillow. We are permitted to change into clean clothes only every other day. Recently, they have not always had a change of clothes in my

size and I had to wait longer between changes.

36. I am not permitted to order most items available through the FDC commissary. The SHU commissary list permits ordering only over-the-counter pharmacy items (like aspirin and antacids), stamps, and envelopes. During the first couple of weeks, SHU detainees were permitted to order 1 cookie and 1 bag of chips per week. Those items are no longer offered. SHU commissary offers no condiments or other food items. We are allowed to eat only the meals that are brought to our cells and must finish each meal within 30 minutes.

37. In SHU there is no hot water for showers, hand washing, or to prepare hot beverages. The shower is only a trickle of cool water and the basin in my cell has barely a trickle of water like an old-fashioned water fountain.

38. SHU detainees are, according to the handbook I received when I arrived at FDC, supposed to be locked down for 23 hours each day, and permitted 1 hour for exercise or library time. My experience has been that I am locked down 24 hours every day, 7 days per week, except when I have legal calls/visits or video visits with my mom. This has been very difficult because of the isolation but also because I know that I am supposed to stand trial on very serious charges in

January 2024, but I am unable to work on my defense.

39. Exercise time is not functional. The "exercise" room is a roughly 10' x 10' cage with a bare concrete floor. There are no mats or equipment of any kind and only 1 person is permitted to access the exercise cage at a time. I could do calisthenics in the "exercise" room, but would have to stay in my sweaty jumpsuit, t-shirt and boxers until the next change of clothes every other day (at best). I am not permitted to have athletic shoes and would have to exercise either unsafely in my SHU orange Crocs or un-sanitarily with bare feet.

40. I have requested "library" time almost daily, but have not been permitted to use the SHU law library, which is a separate cell in SHU with a computer that is supposed to have legal reference materials available on it. Only 1 person can use it at any time. Sometimes I have been told that someone else is already using the library or that the staff does not have time to take me. Most times I have received no response to my requests. I have been advised that I must ask for library time first thing in the morning for the same day and that library time is available only until noon. We are not supposed to ask in advance of the day we want to use the library and I understand that library requests for the next day

are not considered. No one housed in SHU is allowed to use the regular law library in the education area. Because I have no access to my hard drives and other electronic discovery, I am concerned that if staff took me to the SHU library, I would have nothing to review.

41. I have continued to try to work with the small amount of printed documents and notes in the two expandable folders that I have been allowed to keep in SHU, but this is not very helpful because I cannot take legible notes. While in SHU all my pens and pencils were impounded with my other property and I am permitted to have only a small rubber "pencil." The "lead" of the rubber "pencil" is soft and flexible. If I press lightly enough that the "lead" does not bend, so I can try to write with the tip of the "pencil," no mark is made. If I apply enough pressure to make a mark on paper, the "lead" bends causing any mark to be made with the side of the "lead," and it leaves only a barely legible very light mark. If I press hard enough to make a legible mark, it breaks.

42. In SHU it is nearly impossible to work with my lawyers to prepare for trial.

    a. I am not allowed to use the TRULINCS email for detainees. Before, when I needed to speak with my lawyers I could email them to schedule a call

      or visit, or I could email my mom to contact my lawyers and ask them.

b. When I am given a legal call, it is far less productive than when I was in general population because I am handcuffed to be taken to the room where I am permitted a call, I cannot carry my files to review with my lawyers. Also, where I take the call, there is no table to write on even if I had all my materials and a functional pen or pencil. Worst of all, the call is conducted over a telephone handset that is passed through a transom of the door, which is left open for the duration of the call. The phone barely reaches into the room and I must squat down near the open transom to use the phone. It is noisy outside and it is hard to hear my lawyer on the phone. Worse, guards are posted outside the room while I am using the phone and are able to hear everything I say to my lawyer. The calls are not confidential, even though I'm told they are not recorded.

c. After I was taken to SHU, my attorneys were allowed only non-contact visits for nearly a month. A non-contact visit means that I meet with my lawyers from a locked room. My lawyers are in another room and we can see each other through a large glass window and are able to speak to each

       other on a telephone handset. In my room there is no table—only a narrow (about 5") ledge—to use to write on or to lay out documents to discuss. I do not have my electronic discovery and there is no computer I can use to open files to discuss with my lawyers.

   d. On June 8, 2023, my lawyer was able to get a "contact" visit with me. But under the SHU detainee restrictions, this was not especially useful either. As a detainee assigned to SHU, FDC requires I be handcuffed and belly-chained the entire time I am out of the unit. On June 8, at my only contact visit so far, I was handcuffed and belly chained the entire time I was in the attorney visiting room. My lawyer asked the staff if I could have at least one hand uncuffed so that I could turn pages of paper documents and scroll through electronic documents on my lawyer's laptop computer, but they said there were not allowed to. I was not able to bring with me any electronic discovery or printed materials because I cannot carry these items because of the restraints. Also, my electronic discovery is all impounded and not available to me.

   e. At the contact visit, the only work that could be accomplished was verbal

discussion with my lawyer and for her to read documents aloud to me. After a few hours my lawyer noticed that the handcuffs were digging into my wrists, which had become red and painful. She asked the guards in the visitation area if it would be possible to at least re-cuff me to prevent further injury. Although the secured visiting area had been completely shut down for the visit so that no one was in the secured area except me, my lawyer, and the FDC guards, the guards said they could not remove the handcuffs, even for a moment, because I am housed in SHU.

f. I don't think I can get my legal materials that are impounded. I asked a guard in SHU for a paper from my property and was told that they could not do that because they did not want to be responsible for possible improper access of my confidential materials.

POSSIBLE RELEASE FROM DETENTION

43. I understand that the charges against me are very serious and if convicted I could be sentenced to life in prison, but my limited review of the government's evidence has convinced me that I can successfully defend the charges at trial.

44. I also understand that my parents have offered to post their entire equity in

their home to secure a bond for my release. That is the home I grew up in and my parents have worked hard to own their home. It is the home my son knows as his grandparents and daddy's house. I would never do anything to jeopardize that home, my parents, or my son. If permitted pretrial release, I will carefully comply with any and all conditions imposed by the court and carefully comply with instructions from pretrial services.

45. I understand that if I were to violate any condition of my release that:

   a. my parents would lose their home,

   b. I would be returned to custody and unable to defend my case; and

   c. I would lose time with my son.

**I declare under penalty of law that the foregoing is true and correct to the best of my knowledge and belief.**

DATED: Honolulu, Hawaiʻi, June 14, 2023.

                                                /s/ John B. Stancil
                                                JOHN B. STANCIL